**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

GABRIEL DAVID GOMEZ,

        Plaintiff,

vs.                               No. 1:03-cr-00568-WJ

UNITED STATES OF AMERICA,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO DISQUALIFY JUDGE WILLIAM JOHNSON**

THIS MATTER is before the Court on Defendant Gabriel David Gomez's Motion to Disqualify Judge William Johnson. **[CR Doc. 731]**. Defendant Gomez has presented no basis, in law or fact, to support disqualification in this case. Accordingly, the Court denies the Motion to Disqualify.

On July 30, 2025, three counseled motions were filed on behalf of Defendant Gabriel David Gomez: (1) a Motion for Reduction of Sentence **[CR Doc. 733]**; (2) an Assented-To Motion to Exceed Page Limits **[CR Doc. 732]**; and (3) a Motion to Disqualify Judge William Johnson **[CR Doc. 731]**. The Motion to Disqualify proceeds under both 28 U.S.C. § 455(a) and 28 U.S.C. § 144. **[CR Doc. 731 at 1]**. The Motion is signed by *pro hac vice* counsel for Mr. Gomez: David J. Apfel of Goodwin Procter LLP's Boston, Massachusetts office. Associated with him on the filings are senior trial attorney Richard Sillett, based in the firm's Washington, D.C. office, and Zachary Weinstein, an associate in the firm's Boston office. Although originally admitted *pro hac vice* in association with local counsel, local counsel does not appear on any of the July 30, 2025, filings.

1

Attorney Apfel raises a number of allegations for disqualification, ranging from racial bias to issuance of improper injunctions.

<u>**Factual and Procedural Background**</u>

Gabriel David Gomez was indicted by a Grand Jury on March 25, 2003, on one count of conspiracy to distribute 1000 kilograms or more of a substance containing a detectable amount of marijuana and 52 counts of money laundering. **[1:03-cr-00568-WJ ("CR") Doc. 1]**. The forfeiture count of the Indictment, Count 68, sought forfeiture of $15,657,670.00. Gomez was one of several co-defendants in the proceeding. A few days before jury selection was to commence in Gomez's jury trial, he pled guilty to all counts without the benefit of a plea agreement. **[CR Doc. 343]**. Gomez was sentenced to 360 months on Count 1 (distribution), 240 months as to each of Counts 2-24 (money laundering), and 120 months as to each of Counts 30-54 (money laundering), to run concurrently for a total term of incarceration of 360 months. He was also sentenced to a total term of supervised release of 5 years. The Judgment and Commitment Order was entered on May 24, 2005. **[CR Doc 500]**.

Gomez appealed to the United States Court of Appeals for the Tenth Circuit on May 25, 2005. **[CR Doc. 503]**. The conviction and sentence were affirmed in full by the Tenth Circuit on January 8, 2007. **[CR Doc. 565]**. In affirming, the Tenth Circuit noted that in an evidentiary hearing prior to sentencing, the government presented evidence that, at Gomez's direction, more than 40,000 pounds of marijuana had been transported from Mexico and distributed throughout the United States, that Gomez possessed a firearm, obstructed justice by intimidating a witness, and led a criminal enterprise of more than five people. **[CR Doc. 565 at 3]**. The Tenth Circuit also noted that the U.S. Sentencing Guidelines provided for a life sentence in Gomez's case, but, treating the Guidelines as advisory rather than mandatory, and after considering the sentencing

factors of 18 U.S.C. § 3553(a), this Court determined that a life sentence would be unfair to Gomez. **[CR Doc. 565 at 4]**.  Accordingly, the Court varied downward from a low-end guideline sentence of life and imposed a 30-year custody sentence.[1]

Over five and a half years elapsed before Gomez filed a *pro se* motion to vacate, set aside, or modify conviction or sentence under 28 U.S.C. § 2255 on March 25, 2013.  **[CR Doc.653]**. Consistent with statutes, rules, and case precedent, the Court treated the § 2255 proceeding as a civil habeas corpus proceeding and opened *Gabriel David Garcia v. United States,* **No. 2:13-cv-00287-WJ-ACT ("CV") [CV Doc. 1]**.  Also consistent with policy at the time, the Court "dual docketed" 2255 filings in both the civil and criminal cases.  The 2255 proceeding was referred, first, to Magistrate Judge Torgerson and after reassignment, to Magistrate Judge Vidmar.  **[CV Doc. 4, 28]**.  From there, another five years of highly contested, adversarial proceedings that included two interlocutory appeals to the Tenth Circuit, one petition for writ of mandamus to the Tenth Circuit, a motion to dismiss the proceedings, and two motions to disqualify the judges and/or transfer the case transpired. **[CV Doc. 30, 43, 48, 52; CR Doc. 667, 669, 691, 696, 700]**.  Around the time of the first motion to disqualify, Gomez began a pattern of telephone calls to the Clerk's Office and Chambers.  The Court entered an Order prohibiting Gomez from making telephonic inquiries and directing him to submit any requests he had for information in writing.  **[CV Doc.**

---

[1] Mr. Gomez was sentenced on May 24, 2005. **[CR Doc 500]**.   The now-foundational decision in *United States v. Booker*, 543 U.S. 220 (2005), had been handed down by the United States Supreme Court on January 12, 2005.  *Booker* held that the United States Sentencing Guidelines should not be treated as mandatory in sentencing proceedings, changing the legal landscape in sentencing. Given the short time between *Booker* and Mr. Gomez's sentencing, there was very little guidance from case law on how to apply this change in the law.   On appeal, Mr. Gomez challenged the Court's application of *Booker,* arguing that the Court treated the Guidelines as mandatory. However, the Tenth Circuit concluded that "the District Court's conduct, as well as its words, demonstrates that the Court did not treat the Guidelines as mandatory."  **[CR Doc. 565]**.   The Gomez sentencing may very well have been the undersigned Judge's first downward variance from the Sentencing Guidelines.

**44; CR Doc. 692]**.  The interlocutory appeals were dismissed by the Tenth Circuit for lack of jurisdiction and the petition for mandamus was denied.  **[CV Doc. 33, 53, 55, CR Doc. 679, 699, 701].**

Magistrate Judge Vidmar issued his Proposed Findings and Recommended Disposition (PFRD) in the 2255 proceeding.  The PFRD recommended (i) denial of the § 2255 motion on the grounds that it was untimely and barred by the applicable statute of limitations and (ii) dismissal of the proceeding with prejudice. **[CV Doc. 58; CR Doc.706].**  Defendant Gomez filed objections to the PFRD.  **[CV Doc. 62; CR Doc. 710].**[2]  The Court then overruled Defendant's objections, adopted the PFRD, and dismissed the § 2255 motion based on the bar of the statute of limitations. **[CV Doc. 68; CR Doc. 716].**  By a separate Order entered August 14, 2025, **[CV Doc. 69]**, the Court also denied a Certificate of Appealability.  28 U.S.C. § 2253(c)(2); Rule 11 of the Rules Governing Section 2255 Proceedings.

Although permitted to do so by law, Defendant Gomez never filed a request for a Certificate of Appealability in the Tenth Circuit, nor did he attempt to file any appeal from the Court's dismissal of his § 2255 motion on statute of limitations grounds.  Instead, on August 18, 2015, Mr. Gomez filed a motion to stay the § 2255 proceedings.  **[CV Doc. 71; CR Doc. 719].** Specifically, Defendant requested a stay of 140 days so that he could (1) file a motion to disqualify all of the judges for the District of New Mexico and the Tenth Circuit Court of Appeals and also to transfer the proceedings elsewhere; (2) make a formal complaint to the Judicial Council of the Tenth Circuit for the circuit judges' alleged misconduct; (3) make a formal complaint to the House Judiciary Committee and Office of General Counsel for the Administrative Office of the Courts;

_____

[2] Defendant Gomez actually filed a *pro se* Motion to Strike Government's Filings and Vacate Magistrate Judge's Order and Proposed Recommendation, which the Court construed as objections to the PFRD.

and (4) file a motion to "recall and vacate" the Tenth Circuit's orders on his appeals and petition for writ of mandamus. **[CV Doc. 71; CR Doc. 719].**

The Magistrate Judge denied Defendant's Motion to Stay, *nunc pro tunc,* on August 19, 2015. **[CV Doc. 74; CR Doc. 720].** The record does not indicate that Defendant ever carried through with any of the filings or complaints identified in his motion to stay. Instead, some five years later in 2020, several attorneys entered appearances on Gomez's behalf. **[CR Doc. 721, 722, 723, 724, 725].** However, no further filings were made in this Court by Defendant Gomez until the counseled filings in 2025 and the latest filings by Gomez follow his practice of seeking judicial disqualification except this time disqualification was raised on behalf of Gomez by his lawyer, David J. Apfel of the Goodwin Procter law firm. **[CR Doc. 731, 733].**

## Legal Standards for Judicial Disqualification and Recusal

The standard for recusal under 28 U.S.C. § 455(a) is one of objective reasonableness. *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 858 n. 7 (1988); *United States v. Cooley,* 1 F.3d 985, 992 (10th Cir. 1993). Under § 455(a), a judge's interest in or relationship to a case and his or her bias or prejudice against persons involved in a case "*all* [must] be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance. Quite simply and quite universally, recusal [is] required whenever 'impartiality might reasonably be questioned.'" *Liteky v. United States,* 510 U.S. 540, 548 (1994) (emphasis in original) (quoting 28 U.S.C. § 455(a)). Section 455(a) was enacted in 1974 "to promote public confidence in the integrity of the judicial process by replacing the subjective . . . standard with an objective test." *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. at 858 n. 7, *quoted in Nichols v. Alley,* 71 F.3d 347, 350 (10th Cir. 1995); *United States v. Cooley,* 1 F.3d at 992.

Under § 455, a judge should recuse if a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality. *American Ready Mix v. Behles,* 14 F.3d 1497, 1501 (10th Cir. 1994) (citations omitted) (quoting *Hinman v. Rogers,* 831 F.2d 937, 938–39 (10th Cir. 1987) (per curiam)); *accord Switzer v. Berry,* 198 F.3d 1255, 1257 (10th Cir. 2000); *United States v. Greenspan,* 26 F.3d 1001, 1005 (10th Cir. 1994). Section 455(a) is subject to an "extrajudicial source factor," which means that, at its base, alleged bias or prejudice must stem from a source outside the judicial proceeding at hand and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. *Liteky,* 510 U.S. at 545 & n. 1, 555 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 583 (1966)).

Under the extrajudicial source factor, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky,* 510 U.S. at 555. Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the case, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Judicial remarks during the course of the proceedings, even if they are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. Such remarks may do so only if they reveal an opinion that derives from an extrajudicial source. *Id.* at 555-56. Further, expressions of impatience, dissatisfaction, annoyance, and even anger, do not establish bias or partiality and are within the bounds of what federal judges may sometimes display. A judge's ordinary statements or actions in the administration of courtroom proceedings do not establish impropriety or impartiality. *Id.*

The reasonableness test is "limited to outward manifestations and reasonable inferences drawn therefrom. In applying the test, the initial inquiry is whether a reasonable factual basis

exists for calling the judge's impartiality into question." *Cooley,* 1 F.3d at 993, *cited in Nichols,* 71 F.3d at 351. "'In conducting this review, we must ask how the[] facts would appear to a well-informed, thoughtful and objective observer,' who is 'an average member of the public,' not a 'hypersensitive, cynical, and suspicious person.'" *United States v. Woodmore,* 135 F.4th 861, 874 (10th Cir. 2025) (quoting *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310 (10th Cir. 2015). Thus, "[r]umor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters" are not grounds for disqualification under § 455(a). *Id.* (citing numerous cases). Furthermore, attempts to intimidate a judge do not ordinarily satisfy the requirements of § 455(a). *Id.; accord Greenspan,* 26 F.3d at 1006. Finally, § 455(a) "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Cooley,* 1 F.3d at 993 (quoting *Franks v. Nimmo,* 796 F.2d 1230, 1235 (10th Cir.1986) (further quotation omitted)), *quoted in Switzer,* 198 F.3d at 1258; *Nichols,* 71 F.3d at 351.

Disqualification of a judge for bias or prejudice proceeds under 28 U.S.C. § 144. Section 144 provides:

> Whenever a party to any proceeding in a district court makes a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, such judge shall proceed no further therein . . . .

Disqualification under 28 U.S.C. § 144 places a substantial burden on the moving party to demonstrate that the judge is not impartial, not a burden on the judge to prove that he is impartial. *United States v. Burger,* 964 F.2d 1065, 1070 (10th Cir. 1992). The affidavit of personal bias and prejudice need be timely and sufficient. 28 U.S.C. § 144. There must be a reasonable factual basis

to question the judge's impartiality.  *United States v. Cooley,* 1 F.3d at 993.  The scope of inquiry is limited to outward manifestations and reasonable inferences drawn therefrom.  *Id.*

Sections 144 and 455 do not require recusal based only on assumptions about a judge's beliefs that are not substantiated by the facts of record.  *See Nichols,* 71 F.3d at 351; *Bryce v. Episcopal Church,* 289 F.3d 648, 659–60 (10th Cir. 2002).  *In re McCarthey*, 368 F.3d 1266, 1269–70 (10th Cir. 2004).  A movant's factual allegations do not have to be taken as true.  Further, under either § 144 or § 455 there is as much obligation for a judge not to recuse when there is no occasion to do so as there is to recuse when there is a reasonable basis to do so.  A judge should not recuse based on unsupported, irrational, or highly tenuous speculation and accusations. *American Ready Mix,* 14 F.3d at 1501 (citations omitted) (quoting *Hinman v. Rogers,* 831 F.2d 937, 938–39 (10th Cir. 1987) (per curiam)); *accord Switzer,* 198 F.3d at 1257; *United States v. Greenspan,* 26 F.3d at 1005; *Cooley,* 1 F.3d at 993–94.

## <u>Analysis</u>

The Motion to Disqualify, first, asserts that Defendant Gomez was given an unreasonable sentence for a simple, non-violent marijuana conviction that is no longer a crime in New Mexico and several other states.  **[CR Doc. 731 at 1; CR Doc. 732-1 at 30]**.  A number of states, including New Mexico, have legalized personal use quantities of marijuana.  However, marijuana still remains an illegal Schedule I controlled substance under federal law.  21 U.S.C. § 812, Schedule I.  It is difficult to understand how a changing legal landscape under state laws over time could possibly require disqualification of the sentencing judge in a federal case, particularly when the judge sentenced the Defendant twenty years ago according to the existing federal legal landscape at the time of sentencing, ***as required by law***.  *See United States v. Swanson,* 360 F.3d 1155 (10th Cir. 2004) (absent *ex post facto* issues on retroactive application of an Amendment, the generally

applicable Sentencing Guidelines are the Guidelines in effect at the time of sentencing).  Moreover, even if Defendant Gomez's sentence was calculated according to the currently applicable Sentencing Guidelines, his Guideline range would be 360 months to life imprisonment, and the 360-month sentence imposed in 2005 would still be at the low end of the Guideline range. **[Probation Office Report, Doc. 745 at 1-2].**

The Court acknowledges that the sentence imposed on Defendant Gomez would have been unreasonable for a simple, single count, conviction for conspiracy to distribute a minor quantity of marijuana.  However, 1000 grams and more of marijuana is not a minor quantity and in fact evidence was presented that Gomez was involved in the distribution of more than 40,000 pounds of marijuana.  Further, the argument presented by Attorney Apfel ignores the fact that Gomez was also sentenced for ***fifty-two (52)*** counts of criminal money laundering and was subject to a forfeiture count of over $15.5 million.  While the single count of conviction for conspiracy to distribute 1,000 grams or more of marijuana obviously was a major factor in Gomez's 30-year sentence, his other 52 counts of conviction were for the crime of money laundering, a criminal offense distinct from conspiracy to distribute marijuana.  It is also important to note that Defendant Gomez knowingly and voluntarily pled guilty, "straight-up" and without a plea agreement, to ***all*** of the counts charged in the Superseding Indictment and the Tenth Circuit affirmed *in toto* the sentence imposed.  **[CR Doc. 565].**[3]  The sentence imposed was not the result of bias relating to

---

[3] Defendant Gomez's trial was set to commence on February 2, 2004.  **[Doc. 275].** Gomez pled guilty without a plea agreement on January 29, 2004, a few days before the scheduled trial. **[Doc. 343].**

marijuana offenses or against Mr. Gomez but, instead, was a sentence handed down consistent and in compliance with existing federal law in effect at the time.[4] **[CR Doc. 565].**

Moreover, a generalized change in the legal "landscape" over time does not, in and of itself, justify disqualification of the judge who imposed the sentence. The 30-year sentence imposed in 2005 would still be at the low end of the Sentencing Guidelines range, even if calculated according to the applicable Sentencing Guidelines in effect at the present time. **[Doc. 745 at 1-2].** Further, absent United States Supreme Court precedent making a change in the law retroactively applicable to prior convictions and sentences, the law that remains in effect is the applicable federal law at the time the sentence was imposed. *See, e.g.*, *Chaidez v. United States,* 568 U.S. 342 (2013) (holding subsequent changes in the law are not applicable to sentences imposed prior to the changes absent a Supreme Court holding of retroactive applicability). Counsel's argument that Gomez was sentenced for a victimless, non-violent crime that is not, today, a crime in New Mexico and several other states appears to reflect changes in the court of popular opinion, not actual changes in the law. Under current New Mexico state law, trafficking 40,000 pounds of marijuana would still constitute a felony crime. See N.M. Stat. Ann. §§ 26-2C-28(B), (F). Popular opinion never constitutes a basis for judicial recusal or disqualification. *United States v. Woodmore,* 135 F.4th at 874.

The Motion to Disqualify also argues that Defendant Gomez's sentence was the result of racial bias against Mr. Gomez because he is Hispanic. **[CR Doc. 731 at 2].** Perhaps counsel for Defendant is unfamiliar with the rich cultural diversity that informs the Land of Enchantment. New Mexico is one of only a handful of minority-majority states in the country. Hispanics

---

[4] This should not be construed as an indication of how the Court will rule on Defendant Gomez's motion for a reduction of sentence. The Court will rule on that motion in accordance with the applicable law and statutes governing sentence reductions and compassionate release.

constitute approximately 50% of the population of the state, while non-Hispanic whites account for approximately 36%, Native Americans are 11%, and the remining 4% is accounted for by other races. *See, e.g.,* New Mexico Department of Workforce Solutions, Labor Market Review, *New Mexico Data Focus: Hispanic or Latino Ethnicity* (August 2023). The demographics of criminal defendants that come before the Court are similar to the population demographics of the District of New Mexico.

Counsel for Defendant, however, does not point to one shred of evidence that this Judge or any other judge within the District has a pattern or practice of racial discrimination against any group, including Hispanics. Nor could counsel point to any such evidence because none exists. This Court and every judge of the Court, including the undersigned, are deeply committed to the Constitutional judicial system of equal justice for all according to the rule of law. *See, e.g.,* Administrative Order 25-MC-00004-27 at 2 ("The dispensing of justice is mandated by the United States Constitution and is essential to our system of government.").

To the extent counsel for Defendant Gomez argues there was bias against Mr. Gomez, individually, based on the length of the sentence imposed, that argument also does not present a basis for disqualification. As previously noted, judicial rulings, alone, do not constitute a valid basis for a bias or partiality motion. *Liteky,* 510 U.S. at 555. Moreover, the Tenth Circuit's affirmance of the sentence expressly recognized that the sentence imposed varied downward to 360 months from the life imprisonment that the Sentencing Guidelines called for in this case:

> After considering the § 3553(a) factors, the sentencing court
> determined that a life sentence would be unfair because it was the
> same sentence imposed on Mr. Gomez's co-defendant who
> did not plead guilty, showed no remorse, and denied his involvement
> in the criminal enterprise.

**[CR Doc. 565 at 4]**.   The Court clearly did not give Defendant Gomez the benefit of a **_downward_** variance because the Court was somehow biased against him.

Defendant's Motion observes that one of Gomez's co-defendants, Roybal, died in prison a few years after a life sentence was imposed and therefore, in fact served less time in prison than Gomez has.   **[CR Doc. 731 at 1-2]**.   However, as counsel likewise observes, Gomez received a more lenient sentence than Roybal, in part because of Gomez's acceptance of responsibility.   **[_Id._; CR. Doc. 733 at 6–7, 565 at 4]**.   Roybal died in custody on February 27, 2006 — approximately nine months after Gomez was sentenced.   **[CR Doc. 538 at 1]**.   Therefore, to the extent that counsel suggests that Roybal's death, and its effect on the length of his time of incarceration, influenced this Court's sentencing decision in Gomez's case, that argument cannot seriously be considered for the simple reason that Roybal died after Gomez was sentenced.   Moreover, the time Roybal served upon his death simply does not reflect bias against Gomez or any other co-defendant.   This argument likewise provides no basis for disqualification of the Judge.[5]

In addition, Defendant's Motion argues for disqualification based on events occurring in the late 1970s — more than four decades ago — when the undersigned Judge attended college at the Virginia Military Institute.   Attorney Apfel references a 2020 article in the _Santa Fe New Mexican_ that included a yearbook photo from this period of a group of students including the undersigned Judge.   **[_See_ Court's Exhibit 1].[6]**   The photo displays a confederate flag, which two

---

[5] The filings imply that the Court somehow divined Roybal would not live a long time and imposed a life sentence knowing Roybal would not live (and therefore serve) more than a few years.  See CR Doc. 731 at 1-2.  However, the Court imposes sentences according to the law, not according to crystal-ball gazing.

[6] In the interest of full disclosure and to avoid matters being taken out of context, Exhibit 1 to this Memorandum Opinion contains a complete copy of the _Santa Fe New Mexican_ newspaper article referenced by Attorney Apfel and a complete copy of the email letter submitted by the undersigned Judge to the author of the article.

students are holding.   The Court is at a loss to understand how a photo in which the Judge appeared at the age of 18, 19, or 20, decades prior to Defendant's sentencing and the subject newspaper article, could possibly have impacted Defendant's sentence or provide any basis for disqualification.

Justifiably, socio-political views have evolved since the 1970s and have called into question the use of Confederate design elements.[7]   The undersigned Judge recognizes that many now view the design to symbolize slavery, oppression, racial injustice and inequality.   The undersigned Judge does not condone bigotry or oppression and does not endorse symbols thereof. Had the undersigned Judge had the awareness and foresight as a young adult to recognize that the image could reasonably be perceived as representing perspectives the Court does not share, he would have elected not to participate in the photograph.   However, the undersigned's presence in a decades-old college yearbook photo and the evolved public perception of Confederate imagery bear no relation to Mr. Gomez's criminal conduct decades later and do not establish any bias, prejudice, or bigotry on the part of the Court in Defendant Gomez's criminal proceedings.   To the contrary, counsel's argument appears to be calculated either to defame the Judge or to intimidate

---

[7] The Court notes that the use of Confederate state and battle flags has been the subject of varying perceptions through the 20th century and well into the 21st century.   In the late 1970s, the flags of several of the states that seceded from the Union to form the Confederacy and numerous municipalities incorporated elements of Confederate state and battle flags, and those flags were regularly displayed in public.   During World War II, United States Military units carried battle flags incorporating elements of the Confederate flags into battles in the Pacific theater of war.   *See* Wikipedia, *Modern Display of the Confederate Battle Flag*.   As of 2015, Alabama, Arkansas, Florida, Georgia, Tennessee, North Carolina and Mississippi still included Confederate flag elements. As part of a display of historic flags, a Confederate flag flew over the San Francisco City Hall as late as 1984, and stained-glass windows depicting the Confederate flag were not removed from the National Cathedral in Washington, D.C., until 2017.   *Id.*   Moreover, the Commonwealth of Virginia recognized Lee-Jackson Day as a state holiday in honor of Confederate Generals Robert E. Lee and Thomas "Stonewall" Jackson until the Virginia General Assembly eliminated the holiday in 2020.   *See* Virginia General Assembly, SB 601 Legal Holidays, Elections (2020).

and improperly influence the Court's rulings on Defendant's Motion.  *See* Fed. R. Crim. P. 49(a)(4); Fed. R. Civ. P. 11(b); Rule 16-802(A) of the New Mexico Rules of Professional Conduct. Counsel's factually unsupported assumptions about the Judge's beliefs do not require recusal.  *See Nichols,* 71 F.3d at 351; *Bryce v. Episcopal Church,* 289 F.3d 648, 659–60 (10th Cir. 2002).  *In re McCarthey*, 368 F.3d 1266, 1269–70 (10th Cir. 2004).

Last, the Motion to Disqualify raises the order entered during Defendant's pro se § 2255 proceeding, directing him to stop making telephone calls to the Clerk's Office and, instead, to submit any requests for information in writing.  **[CR Doc. 731 at 3-7].**  Defendant contends the order amounted to an improper injunction against him.  **[CR Doc. 731 at 3].**  The District of New Mexico is one of the busiest federal courts in the country, with an extremely heavy criminal caseload.  And, as defense counsel should be aware, the Constitution requires that the Court give the criminal cases priority over all civil cases and protect the Speedy Trial rights of all criminal defendants.  Section 2255 proceedings are treated as civil proceedings in the federal court system. See the Rules Governing Section 2255 Proceedings for the United States District Courts. The Court's resources are limited and if the Court allowed all pro se § 2255 litigants to have unlimited telephone access to the Clerk's Office, that office's ability to complete the necessary work of the Court would be significantly impaired.  As a consequence, the Court has adopted rules and procedures restricting telephone access to the Court *for all pro se litigants.*  See the District of New Mexico's Guide for Pro Se Litigants at 10-11 (noting that communications with the court should be in writing and limiting telephone access to chambers and Clerk's Office staff).

The Court's order **[CV Doc. 44]** was not an ***improper*** injunction against Defendant Gomez, but, instead, a neutral enforcement of the Court's rules and procedures. Further, to the extent counsel's argument implies the Judge acted on his own *ipse dixit* due to personal animosity toward

Defendant Gomez, it must be noted that pursuant to 28 U.S.C. § 636(b)(1)(A), Magistrate Judges lack authority and only a District Judge may enter such an order. Under standard procedures in the District of New Mexico, the order would have been entered at the request of a Magistrate Judge or court staff, and not on the whim of the District Judge. *See* CV Doc. 44 at 1 ("it has come to the Court's attention . . ."). Defendant's argument regarding his 2255 proceedings, again, does not substantiate any basis for disqualification in this or any other case.[8] Defendant Gomez filed a Notice of Interlocutory Appeal, appealing the order to the Tenth Circuit, and the appeal was dismissed by the Circuit court for lack of jurisdiction. **[CV Doc. 48, 51].** Gomez then filed a Petition for Writ of Mandamus in the Tenth Circuit, which was denied. **[CV Doc. 52, 53].**[9] The order is simply not a basis for judicial disqualification.

Last, Defendant Gomez contends that the Court's denial of a Certificate of Appealability of the Court's dismissal of his 2255 Motion demonstrates bias against Mr. Gomez. Defendant argues that, because the Court dismissed the Motion on limitations grounds, rather than the merits, the language of the denial — that Defendant had failed to make a substantial showing of denial of a constitutional right — reflects bias against Mr. Gomez. The grant or denial of a certificate of appealability is mandated in every § 2255 case and denial of a certificate of appealability requires

---

[8] Counsel for Defendant also argues that the Court's order was designed to improperly withhold and avoid providing documents and filings to Defendant. **[CR Doc. 731 at 5-6].** Counsel's argument conveniently ignores the fact that, when Defendant requested access to the Court documents in a written motion, as directed by CV Doc. 44, the Court ordered that access to the Court documents be "***made immediately available***" to Defendant and his counsel. **[CV Doc. 74 at 1].**

[9] In its denial of the Petition for Writ of Mandamus, the Tenth Circuit stated "Mr. Gomez has a right to conduct his § 2255 proceeding, but that does not entail a right to communicate by telephone with the district court clerk's office . . . the district court's order does not prohibit Mr. Gomez from prosecuting his case, but merely limits his *ex parte* telephone communications with court staff . . . further, it is not apparent that the order is a sanction, rather than an administrative case-processing measure . . ." **[CV Doc. 53 at 2-3].**

a finding by the Court that the defendant has failed to make a substantial showing of denial of a constitutional right.  *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2255 Proceedings in the District Courts.  This standard applies regardless of whether the 2255 motion is denied on procedural grounds or on the merits.  *See Slack v. McDaniel,* 529 U.S. 473, 483-485 (2000).  The form and content of the Order **[CV Doc. 44]** are standard and consistent with orders entered in all other 2255 proceedings brought in this District and do not reflect any individualized animus toward Defendant Gomez.

In conclusion, there is no factual or legal merit to Defendant's Motion to Disqualify.  A judge has an obligation not to recuse when there is no occasion to do so.  A judge should never recuse based on unsupported, irrational, or highly tenuous speculation and accusations.  *American Ready Mix,* 14 F.3d at 1501; *Switzer,* 198 F.3d at 1257; *Greenspan,* 26 F.3d at 1005; *Cooley,* 1 F.3d at 993–94.  Consistent with the undersigned Judge's obligation to continue to preside over this case because there is no basis for disqualification, the Court denies the Motion to Disqualify.

**IT IS ORDERED:**

(1) the Motion to Disqualify Judge Johnson **[Doc. 731]** is hereby **DENIED;**

(2) the Unopposed Request for Oral Argument on Motion to Disqualify **[Doc. 743]** is **DENIED** as moot.

/s/

_____
WILLIAM P. JOHNSON
SENIOR UNITED STATES DISTRICT JUDGE

**Chief federal judge in Albuquerque says he regrets photographs with Confederate flag**



- By Phaedra Haywood phaywood@sfnewmexican.com

- Jun 27, 2020



William P. Johnson is second from left in the back row.

Courtesy photo

William P. Johnson, chief U.S. district judge for New Mexico, said in a written statement last week he regrets having appeared in two photographs "where others made the wrong decision to display the Confederate flag" while he was a cadet at Virginia Military Institute in the late 1970s.

Johnson provided his written comments in response to questions from *The New Mexican* about photos from the 1978 and 1979 editions of the school's yearbook, *The Bomb*, which depict him and other members of the College Republicans club formally posing with a Confederate flag.

"I do not recall these photographs being taken, yet I am in these two images," Johnson wrote in a statement, adding the photographs appear to have been taken during his freshman and sophomore years. He wrote he believes the cadets holding the flag in front of the group were upperclassmen.

"I do not know or remember the individuals holding the flag in either photo," Johnson wrote, "yet I regret that, when I was 18, 19 or maybe 20, I appeared in two photographs where others made the wrong decision to display the Confederate flag.

"The Confederate flag obviously represents slavery, oppression, racial injustice and inequality," Johnson added. "I have never owned a Confederate flag, yet as someone who grew up in Virginia, I can say that four decades ago attitudes towards the Confederate flag were more cavalier. I believe this lax attitude

stemmed from the fact many white Americans, like myself, did not at that time fully understand or appreciate what the confederate flag represented to African Americans."

The Confederate flag and other symbols from the South have come under withering scrutiny as the nation renews discussions about race in the wake of George Floyd's death May 25 in Minneapolis. The state flag of Mississippi includes a Confederate emblem, and lawmakers there are pushing to change it. NASCAR recently banned the Confederate flag from its events.

Johnson, 61, originally agreed to be interviewed about the photographs taken when he was a college student, but he later changed his mind and said the written statement would be all he had to say on the matter.

Eric D. Dixon, a Portales civil rights attorney, said in a recent interview he came across the Virginia Military Institute yearbook photos while doing research on the Civil War and was disturbed by what he saw.

"I represent African American plaintiffs in this area, and I just think it's outrageous anybody would appear in front of the Confederate flag knowing what it stands for," Dixon said. "It's as bad as standing in front of a swastika as far as I'm concerned."

Virginia Military Institute is sometimes referred to as the "West Point of the South." It was founded before the Civil War, in 1839 in Lexington, Va., and its graduates include Gen. George C. Marshall, a key architect of the Allied victory in World War II and later a U.S. secretary of state.

The school was racially integrated in 1968 but was the last U.S. military college to admit women, which it did in 1997 as a result of a Supreme Court order that followed a six-year legal battle over the issue.

Col. William Wyatt, Virginia Military Institute's director of communications, said in a recent phone interview the school phased out the playing of "Dixie" in the 1970s and stopped using the Confederate flag in the 1990s.

First-year cadets were required to salute a statue of Confederate Gen. Stonewall Jackson until 2015. Since then, Wyatt said, cadets have been required to salute the U.S. flag.

The statue of Jackson still stands at Virginia Military Institute, and Wyatt said the school has since included more information about Jackson's role in the Civil War through a brochure handed out by the school's museum.

The *Roanoke Times* reported earlier this month a recent graduate of the school started a petition June 4 calling for the statue's removal and asked Virginia Military Institute to "acknowledge the racism and black prejudice that still occurs" at the school.

According to the U.S. District Court's website, Johnson graduated from Virginia Military Institute in 1981 and accepted a commission in the U.S. Army Reserve before earning his law degree from Washington and Lee University School of Law in 1985.

He began his judicial career in New Mexico in 1995 as a state district judge in the 5th Judicial District in Roswell.

In 2001, President George W. Bush nominated Johnson to fill a vacancy on the U.S. District Court for New Mexico, which has a sizable role in the justice system because the state sits on an international boundary and includes large swaths of federal land, as well as a patchwork of Native American reservations. Johnson became chief judge of the district, which includes courthouses in Albuquerque, Santa Fe, Las Cruces and Roswell, in 2018.

According to online transcripts, when asked during his confirmation hearing to cite examples of times in his judicial career that he'd demonstrated commitment to equal rights for all, Johnson cited his work on behalf of abused and neglected children.

In his statement, Johnson defended his work on the bench, noting he took an oath to administer justice in an impartial manner.

"As a judge under the Constitution and laws of the United States ... that is the standard under which I have lived and worked since becoming a judge and that is the standard I intend to follow for the remainder of my service as a federal judge," he wrote.

# UNITED STATES DISTRICT COURT
### District of New Mexico
Pete V. Domenici United States Courthouse
333 Lomas Boulevard N.W. , Suite 770
Albuquerque, New Mexico  87102

William P. Johnson                                        Telephone: ████████████
Chief District Judge

June 23, 2020

Ms. Phaedra Haywood, Reporter                    *__Sent via email__*
Santa Fe New Mexican Newspaper

Dear Ms. Haywood:

I am emailing you this letter in response to your inquiry of June 22, 2020 and the two photographs you emailed to me.

I grew up in Roanoke, Virginia and graduated high school in 1977.  During my senior year, I made the decision to attend college at the Virginia Military Institute ("VMI"), a public, state-owned college in Lexington, Virginia located at the southern end of the Shenandoah Valley.  I reported to VMI in August of 1977 and graduated in May of 1981.

VMI is steeped in Civil War history.  Before the Civil War began in 1861, Thomas "Stonewall" Jackson was a professor at VMI.  In May of 1864, the VMI Corps of Cadets was mobilized and fought alongside confederate forces at the Battle of New Market.  Subsequently, Union troops traveled through the Shenandoah Valley,  defeating Confederate troops and destroying much of VMI and Lexington.  Consequently, the Civil War and its impact on VMI will always be part of the school's history.

The confederate flag obviously represents slavery, oppression, racial injustice and inequality.  I have never owned a confederate flag, yet as someone who grew up in Virginia, I can say that four decades ago attitudes towards the confederate flag were more cavalier.  I believe this lax attitude stemmed from the fact many white Americans, like myself, did not at that time fully understand or appreciate what the confederate flag represented to African Americans.

Yesterday, you made inquiry about two photographs of the College Republicans Club of which I was a member during my four years at VMI.  The first photo appeared in the 1978 VMI yearbook more than 42 years ago, and the second photo appeared in the 1979 yearbook more than 41 years ago.  I do not recall these photographs being taken, yet I am in these two images photographed during my freshman (Fourth Class) and sophomore (Third Class) years at VMI where cadets, who I believe were upperclassmen (seniors or juniors), are holding the confederate flag.  I do not know or remember the individuals holding the flag in either photo, yet I regret that, when I was 18, 19 or maybe 20, I appeared in two photographs where others made the wrong decision to display the confederate flag.

Ms. Phaedra Haywood
June 23, 2020
Page Two


In February of 1995, I took an oath as a New Mexico state district judge and, in December of 2001 when I became a federal district judge, I took a somewhat similar oath to "…administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent of me…" as a judge under the Constitution and laws of the United States.  *See* 28 U.S.C. § 453.  That is the standard under which I have lived and worked since becoming a judge and that is the standard I intend to follow for the remainder of my service as a federal judge.


Very truly yours,

William P. Johnson